**BLAND et al., Appellants,**

**v.**

**GRAVES, Appellee.**

[Cite as *Bland v. Graves* (1993), 85 Ohio App.3d 644.]

Court of Appeals of Ohio,
Summit Count.

No. 15586.

Decided April 7, 1993.

*A. Joseph Waterman* and *Rankin M. Gibson*, for appellants.

*Howard L. Calhoun*, for appellee.

REECE, Judge.

This cause comes on appeal from the order of the Summit County Probate Court granting a new trial pursuant to Civ.R. 59(D), following a jury verdict finding that the testator, Irene Willis, lacked testamentary capacity in the making of her will and a codicil thereto.

Irene Willis was born on April 2, 1907, as the only child of Clarence and Mary Frisby Williams. She married Samuel Reese Willis (known as Reese) on August 22, 1931. Throughout their marriage they lived at 68 Casterton Avenue, the home of Irene's parents. Besides this residence Irene's parents also owned a vacation cottage on the Portage Lakes in Summit County, Ohio. Both properties are part of Irene's estate. Although a graduate of the University of Akron with a degree in elementary education, Irene never pursued a career. Reese, a graduate of Ohio State University, was an executive with the Goodyear Tire and Rubber Company, retiring after forty years of service.

On April 21, 1988, Irene was admitted to Akron City Hospital where she was diagnosed with cancer. Upon being released from the hospital on May 20, 1988, Irene was transferred to Manor Care Nursing Home. While a resident in the nursing home Irene, with the assistance of attorney James Graves, executed a will on August 2, 1988. This apparently is the first time Irene ever made a will, no other will having been propounded during these proceedings.

In her will Irene made specific bequests of $100,000 each to the First Presbyterian Church of Akron and the Summit County Chapter of the American Red Cross. Besides another specific bequest of a ring, the remainder of her estate was left to seven residual beneficiaries, each taking an equal share. Of these residual beneficiaries only one, Robert J. Frisby of Akron, Ohio, is related

to Irene. Although living at the time of its execution, Reese would receive no property under Irene's will. Testimony was given that Reese and Irene intended that their estates be kept apart, each providing for separate beneficiaries.

On February 8, 1989, Reese died leaving an estate valued at approximately $2.5 million. As in Irene's will, Reese's will made no bequest to his spouse. In keeping with the intent to maintain separate estates, Irene did not exercise her election, pursuant to R.C. 2107.39, to take under the statute of descent and distribution as against Reese's will.

In October 1989, Irene's condition became worse and she was again admitted to the hospital. There she spoke with attorney Graves, expressing her displeasure with Reese's failure to make bequests in his will to two close friends. On October 12, 1989, Irene executed a codicil to her will in which she made an additional specific bequest of $100,000 to the American Cancer Society, and added two residual beneficiaries, neither of whom are related to Irene. With this amendment the total number of residual beneficiaries became nine with each taking an equal share. Later in October, Irene returned to Manor Care, where she remained until her death on November 18, 1989. Unbeknownst to almost everyone, Irene left an estate valued at approximately $2.8 million.

Irene had no children, siblings, or surviving relatives descended from her grandparents. At the time of her death Irene's closest surviving relatives were nine second cousins (in the sixth degree of relationship), descendants of her great-grandparents. Should Irene's will be held invalid, all nine would share equally in the estate under the statute of descent and distribution. R.C. 2105.06. Two of these relatives died prior to the commencement of these proceedings. Their executors, along with five of Irene's second cousins, are plaintiffs in two separate lawsuits, consolidated for trial, challenging the validity of Irene's will.

Plaintiffs allege that at the time of the making of the will and codicil Irene lacked testamentary capacity. Alternatively, they contend that Irene's will and codicil were the result of undue influence. Following a nine-day trial, involving the testimony of thirty-two witnesses, the jury returned a verdict setting aside the will and codicil. From interrogatories submitted, the jury, while finding that the will was not the product of undue influence, held that Irene lacked the legal requisites for testamentary capacity.

Following the verdict, the trial court, *sua sponte*, requested the parties submit briefs concerning the grant of a new trial. After submission of these briefs the court, pursuant to Civ.R. 59(D), granted a new trial limited solely to the issue of testamentary capacity. In its judgment entry of February 4, 1992, the court held the verdict "contrary to law and against the manifest weight of the evidence." But the court upheld the jury finding that Irene was not unduly influenced in the

making of her will. Finally, the judge in a separate entry recused himself from presiding over the retrial.

From this judgment plaintiffs-appellants assert three assignments of error, the first two of which are further broken down into four subparts. The defendants, beneficiaries under the will and codicil, present one cross-assignment of error related to the court's denial of their motions for directed verdict.

### Assignment of Error 1

"The trial court erred to appellants' prejudice when it granted a new trial."

■ Civ.R. 59(D) permits the court on its own initiative to order a new trial for any of the reasons enumerated under Civ.R. 59(A), including the "judgment is not sustained by the weight of the evidence." A determination that the verdict is contrary to the evidence and therefore a manifest injustice rests within the sound discretion of the trial court.

" * * * [T]he generally accepted rule is that a reviewing court should view the evidence favorably to the trial court's action rather than to the jury's verdict. The predicate for that ruling springs, in part, from the principle that the discretion of the trial judge in granting a new trial may be supported by his having determined from the surrounding circumstances and atmosphere of the trial that the jury's verdict resulted in manifest injustice." *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 320, 21 O.O.3d 198, 202, 423 N.E.2d 856, 860. See, also, *Krejci v. Halak* (1986), 34 Ohio App.3d 1, 3, 516 N.E.2d 235, 237; *Sanders v. Mt. Sinai Hosp.* (1985), 21 Ohio App.3d 249, 253, 21 OBR 292, 297, 487 N.E.2d 588, 593.

While deference must be given the trial court's decision, some courts have applied a more stringent standard when dealing with the setting aside of a jury verdict as against the weight of the evidence. Thus, "a more searching inquiry is required to prevent the trial court from 'encroaching on the jury's important fact-finding function.'" *McNeal v. Hi–Lo Powered Scaffolding, Inc.* (C.A.D.C.1988), 836 F.2d 637, 646, quoting *Vander Zee v. Karabatsos* (C.A.D.C.1978), 589 F.2d 723, 729. See 6A Moore, Federal Practice (1992) 59–141, Paragraph 59.08[5].

With this standard in mind we will proceed to address subparts A through D of plaintiffs' first assignment of error.

"(A) The trial court's admission of bias disqualified it from ordering a new trial."

■ After ordering a new trial the judge recused himself from presiding over the rehearing of the case. In doing so, the judge stated:

" * * * After sitting nine (9) days and hearing the evidence presented on the validity of the will and codicil of Irene Willis, this court has expressed a firm conclusion on the validity of the will and codicil as evidenced by its opinion and order for a new trial.

"While this court is capable and understands its duty under Ohio Rules of Civil Procedure to avoid partiality in presiding over any trial or re-trial, it must order its recusal to avoid and insure that, on re-trial, the verdict of [the] jury is rendered without appearance of influence by the court's conclusion as to the validness [sic] of the will and codicil of Irene Willis."

Plaintiffs contend that this entry of the court constitutes an admission of bias thereby rendering the ordering of a new trial an abuse of discretion. We disagree.

█ In deciding whether to grant a new trial the judge has often been referred to as the thirteenth juror. *Dyer v. MacDougall* (C.A. 2, 1952), 201 F.2d 265, 272 (Frank, J., concurring). While this does not mean that the judge may substitute his own judgment for that of the trier of fact, it does require the judge to "view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result." 6A Moore, Federal Practice (1992) 59–150, Paragraph 59.08[5]; see, also, *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 92, 52 O.O.2d 376, 381, 262 N.E.2d 685, 691.

█ The trial court must undertake a limited weighing of the evidence when deciding whether the verdict is contrary to the weight of the evidence. In doing so a judge will necessarily formulate a view of the evidence which, if a new trial is ordered, is obviously contrary to the jury verdict. Thereafter, a judge should consider recusal to ensure that his views do not, even indirectly, permeate and thereby prejudice the retrial. Inferring bias from such determinations by the judge would render any grant of a new trial an abuse of discretion. Rather, the correct standard is to decide whether the grant of a new trial was "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142. In doing so we consider not whether the judge's view of the evidence differed from that of the jury, but whether that view, in light of the totality of the evidence, was clearly erroneous. This brings us to the second part of plaintiffs' first assigned error, that is, does the evidence support the ordering of a new trial?

"(B) The trial court arbitrarily and capriciously held that the jury misunderstood the definition of those who have a natural claim on the decedent's bounty, and that the jury's alleged misunderstanding necessarily tainted parallel findings

on the testator's lack of knowledge and the nature and extent of her property and her relationship to the family members."

The conditions of testamentary capacity were set forth in *Niemes v. Niemes* (1917), 97 Ohio St. 145, 119 N.E. 503, paragraph four of the syllabus, wherein the court stated:

"Testamentary capacity exists when the testator has sufficient mind and memory:

"First, to understand the nature of the business in which he is engaged;

"Second, to comprehend generally the nature and extent of his property;

"Third, to hold in his mind the names and identity of those who have natural claims upon his bounty;

"Fourth, to be able to appreciate his relation to the members of his family."

Five interrogatories were submitted to the jury pursuant to Civ.R. 49(B). The first four of these addressed, in order, each of the four elements of testamentary capacity as given in *Niemes*. In response to the first interrogatory the jury found that Irene did understand she was making a will to dispose of her estate. However, by the third and fourth interrogatories the jury found that at the time of the execution of the will, Irene was not able to identify those persons with "natural claims" upon her bounty and appreciate their relationship to her.

In defining those persons with natural claims to a testator's bounty, the court gave the following general charge:

" * * * The law implies in a will contest some reason or rationality for classifying those who may have a natural claim on the bounty of the testator. Those individuals who may reasonably or rationally be included in a testator's bounty are those who are related by blood, including but not limited to those who would inherit under the Ohio statute of descent and distribution if no valid will existed at the time of the death of the testator. The plaintiffs-contestants are next-o[f]-kin, or the nearest blood relatives of the testatrix, and are, therefore, entitled to inherit. The status of next-of-kin places the plaintiffs-contestants in a classification which allows them to be considered among those who may be those who have a natural claim on his or her bounty. In and of itself, the fact that the plaintiffs-contestants are next-of-kin does not require you to find that they are those who have a natural claim on the bounty of Irene Willis. It is one of the factors you may or should consider * * *."

Thereafter, the jury submitted two questions seeking further instruction:

"[By the Court]

"The first question [is], 'Is the attorney [drafting the will] responsible for informing Irene of her family tree and how far down?'

"The second question is, 'Also, is Irene responsible for knowing the names and identities of second cousins, whether or not she knew they existed at the time that she signed the will?' "

The court, after consulting with the parties, gave the following response:

"A testatrix is responsible only to have in her mind the names and identities of those who have a natural claim on her bounty. It is up to you, as a trier of the fact, to determine the identities of those who have a natural claim on the testatrix's bounty. Whether or not Irene Willis knew second cousins existed is a factor you may consider in determining whether they should be included among those persons who would have a natural claim on her bounty."

The jury then requested the court to explain this response "in layman terms," to which the court advised the jury that sufficient instructions had been given.

In reviewing the evidence the basis of the jury's confusion becomes more evident. Besides her husband Reese, the closest relatives Irene had at the time of the making of her will were all second cousins, which is the sixth degree of relationship. Although nine second cousins survived Irene, two of these died prior to trial. Testimony of six of the surviving second cousins was presented. By depositions, Hazel Bristol and Rachel Culver Spillane, descendants of Irene's paternal great-grandparents, testified they had no knowledge of Irene prior to the commencement of this lawsuit. Dorothy Williams Francis, the other second cousin descended from Irene's paternal great-grandparents, died on January 24, 1990. In the depositions of Dorothy's two daughters, executors of her estate, neither had any prior knowledge of Irene.

Irene's remaining relatives descend from her maternal great-grandparents. Jeanne Frisby Bland, while testifying that she saw Irene more frequently when she was young, admitted to little contact since moving from Akron in 1960. The last time she saw Irene was at a funeral in 1982. Eilene Smyth of Cape Coral, Florida, recalled one gathering of the family at the Portage Lakes property. While believing there were other times she saw Irene, she stated that she was "probably too young to recall."

Only two of these cousins testified to visiting Irene with any regularity. Albert Frisby moved from Akron in 1933. A resident of Boardman, Ohio, he started travelling to Akron more frequently in 1983 to visit the graves of his parents. While in Akron he would briefly visit with Irene and Reese at their home. The last of these visits was in 1987. Albert acknowledged that he did not visit Irene following her admission to the nursing home. He recalled last speaking with

Irene at Reese's funeral. On cross-examination Albert stated that each time he saw Irene she was lucid and alert.

The last second cousin to testify was Robert Frisby. Robert frequently visited Irene and Reese, assisting them with the maintenance of their home. As previously mentioned, Robert is the only relative named in Irene's will.

In contrast to these relatives, most of whom had little, if any, contact with Irene over her lifetime, the beneficiaries under the will were all long-time friends of Irene and Reese. Marie Pennebaker (who died on February 2, 1990) and Doris Mason both grew up with Irene, continuing their friendship through adulthood. Three other residual beneficiaries are daughters of these two friends. Another beneficiary under the will, Michele Smith, became acquainted with Reese and Irene in the early 1980s through a mutual friend, George Clayton. Testimony was given that Michele regularly visited the Willises to ensure that their needs were met. In August 1988, after Irene's admission to the nursing home, Michele arranged for a housekeeper to assist Reese. The last beneficiary under the will is Robert Frisby, Irene's second cousin.

After Reese's death Irene spoke with attorney Graves about amending her will. She explained that it was her and Reese's understanding that by their respective wills "he would take care of the boys and she would take care of the girls." Irene expressed her displeasure with Reese's failure to make provisions in his will for certain close friends. By codicil, Irene added Merrill Mason and George Clayton as residual beneficiaries of her estate. Merrill is the husband of Dorothy Mason referred to above. George met Reese at Ohio State University where they were members of the same fraternity. He also worked at Goodyear Tire and Rubber Company with Reese and introduced Michele Smith to the Willises.

Based upon this review of the evidence and the instructions of the trial court, we find sufficient basis for the court's decision ordering a new trial. In *Niemes, supra,* 97 Ohio St. at 156–157, 119 N.E. at 506, the court qualified the requirement that a testator be able to identify his relatives:

"A testator who could not recall the names and identify the degree of relationship he bore to his immediate family, would be at once open to suspicion of having a faulty memory. On the contrary, if such testator had no immediate relatives, it might in cases where there exists a large number of connections be an undue burden to charge him with the necessity of possessing such powers of memory as to be able to recall the names of all his next of kin, and to identify in detail their exact relationship even to the remotest degree." See, also, *Meier v. Peirano* (1945), 76 Ohio App. 9, 16, 31 O.O. 342, 345, 62 N.E.2d 920, 924.

■ While a testator must have sufficient mental capacity to recognize those relatives with a *natural claim* to his estate, this does not require that he must

contemplate all of his relatives even to the remotest degree. Indeed, there may be occasions when a testator is not even aware of the existence of distant relatives. The law does not impose such an insurmountable burden upon a testator, requiring him to first identify and then to specifically disinherit these relatives. Other courts have similarly distinguished between lineal and collateral heirs. See, *e.g., Mangan v. Mangan* (Mo.App.1977), 554 S.W.2d 418, 421. Although distant relatives may be the natural heirs of the estate under the statute of descent and distribution, the factfinder should also consider the nature of the relationship between the decedent and his distant relatives.

*Niemes, supra,* was decided at a time when families were less mobile. As people have become more transient the ties between more remote relatives have become more readily severed. Under such circumstances, as in this case, the jury should be further instructed to consider the interaction between the decedent and his relatives during his lifetime. As the quality and quantity of interaction between a testator and a remote relative increases, during the lifetime of the testator, so to does that relative's "natural claim" to the testator's bounty.

In the present case the court properly instructed the jury as to the test for testamentary capacity as set forth in *Niemes.* While we find no fault in these instructions, we agree that the trial court could, within its sound discretion, find that the jury, under the facts of this case, became confused as to those persons with "natural claims" to Irene's bounty. This confusion is sufficiently demonstrated by the jury's request for additional instructions and from our review of the evidence.

Accordingly, given the deference shown a trial court in deciding to grant a new trial, *Jenkins, supra,* 67 Ohio St.2d at 320, 21 O.O.3d at 201, 423 N.E.2d at 860, we find no abuse of discretion.

"(C) The trial court erroneously passed on credibility and, therefore, abused its discretion in ordering a new trial."

█ The trial court, in discussing the basis for its grant of a new trial, stated:

"First, to the evidence of the general soundness of Irene Willis' mind and memory, there is near unanimity of those who saw Irene Willis near the time she executed her will that she was of sound mind and memory, that she was oriented and could identify those about her, including her relatives and friends. *The number of witnesses who testified to that description of Irene Willis is numerous and credible. They included her treating physician, six staff members of the nursing home, an independent ombudsman called specifically to discuss the preparation of her will, family members and friends.*" (Emphasis added.)

From this, plaintiffs contend that court impermissibly passed upon the credibility of witnesses. The ability of the court to consider witness credibility when

ruling on a motion of new trial was addressed in *Rohde, supra,* 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, at paragraph three of the syllabus, which states in part:

"[I]n ruling on a motion for new trial upon the basis of a claim that the judgment 'is not sustained by sufficient evidence,' the court must weigh the evidence and *pass upon the credibility of the witnesses,* not in the substantial unlimited sense that such weight and credibility are passed on originally by the jury but *in the more restricted sense of whether it appears to the trial court that a manifest injustice has been done and that the verdict is against the manifest weight of the evidence.*" (Emphasis added.)

In their case in chief plaintiffs presented the testimony of the decedent's next-door neighbor and the housekeeper who worked in the Willises' home from August through December 1988. These two witnesses testified to the deplorable condition of the Willises' home, giving anecdotes of what may be considered eccentric behavior by the Willises. These witnesses had little contact with Irene following her admission to the hospital in 1988. Plaintiffs also presented the testimony of Dr. Saltis, a neurologist. He opined, based solely upon his review of the medical records, that Irene suffered from dementia.

In contrast, as the court noted, the defendants presented numerous witnesses having regular contact with Irene at the time of the making of her will. While the court may not pass generally upon the credibility of witnesses it may consider whether the evidence is direct or circumstantial and thus the amount of weight to be accorded to it. We find the trial court did nothing more than this and therefore find no error in such a limited review of witness credibility. *Rohde, supra.*

"(D) The two issue rule prevents a new trial when sufficient evidence and correct instructions were presented for the jury to determine independently that Irene Willis did not understand the general nature and extent of her property."

 In addition to finding that at the time of the making of her will Irene could not identify those persons with natural claims to her bounty and their relationship to her, the jury found that Irene did not understand the extent and nature of her property, the second condition for testamentary capacity under *Niemes, supra.* Therefore, plaintiffs argue that even if the jury misunderstood the instructions regarding the testator's ability to identify and appreciate the relationship of her relatives, the two-issue rule precluded a grant of a new trial. See *Bush v. Harvey Transfer Co.* (1946), 146 Ohio St. 657, 33 O.O. 154, 67 N.E.2d 851, paragraph three of the syllabus. Simply stated, plaintiffs contend the verdict was supported by the jury's alternative finding that Irene did not comprehend the nature of her estate.

In addressing this issue the court found that the jury's misunderstanding of the third and fourth *Niemes* conditions permeated the jury's verdict. In support of this position the court noted that the jury, after twice requesting additional instructions, asked the court:

"We have an agreement with 2 interrogatories, one of which nullifies the Will. Because of this, do we have to complete all the Interrogatories of which we do not have a ¾ agreement of yes or no?"

From this the court concluded that the jurors' attempt at consistency in their responses influenced their answer to the second interrogatory.

Additionally, only two witnesses presented testimony tending to show that Irene was unaware of the size of her estate. William J. Hinkel, a financial planner with Merrill Lynch, handled the investment of much of Irene's holdings. Hinkel testified that these investments were directed by Reese. After Reese's death Hinkel visited Irene on April 9, 1989, at the nursing home. He found that Irene had little knowledge of her investments telling him "if that's what [Reese] always did, go ahead and do it."

The other witness was Mark Allen Brockway, an employee of the Long–Term Ombudsmen Program. Upon learning that Irene intended to draft a will, the staff of the nursing home asked Brockway to meet with Irene. In doing so he found Irene alert and lucid and recalled her stating that she owned "substantial assets." However, his notes from this meeting indicated that he understood the amount of her estate to be approximately $250,000 in contrast to the $2.8 million actual worth.

The testimony of Irene's financial planner, while demonstrating her lack of investment knowledge, did not directly address whether she comprehended the size of her estate. Brockway's notes are suspect in light of the terms of Irene's will and codicil. Because of the specific bequests totalling $300,000 in her will and codicil, along with the bequests to numerous residual beneficiaries, the evidence does not support a finding that Irene believed her net worth to be only $250,000. Finally, several witnesses, including attorney Graves, testified that Irene understood her estate to be worth approximately $2 to $3 million.

Based upon the foregoing, we find no error in the court's ordering of a new trial pursuant to Civ.R. 59(D). Plaintiffs' first assignment of error is therefore overruled.

## Assignment of Error II

"In the event that a new trial should be ordered, the trial court erred when it directed judgment on the issue of undue influence.

"A. The trial court erred when it directed judgment on undue influence because that issue is not distinct and separable from the other issues to be retried, and the two-issue rule precludes a partial retrial on testamentary capacity alone.

"B. The trial court erred in not allowing discovery into appellee Michele Smith's bank records, as those records may disclose evidence tending to prove undue influence.

"C. The trial court erred in excluding evidence demonstrating a pattern of similar acts which tend to support appellants' claim of undue influence on the will for Irene Willis.

"D. The trial court erred because it should have instructed the jury on a presumption of undue influence arising from the designation of non-related fiduciaries as legatees, who also were clients of the draftsman."

While finding that Irene lacked testamentary capacity, the jury, by interrogatory number five, found that the will was not the product of undue influence. Based upon this finding, the trial court limited the issue on retrial solely to Irene's testamentary capacity. Plaintiffs assert error in this order.

Civ.R. 59(A) provides that a new trial may be granted "on all or part of the issues." In addressing this provision, the Ohio Supreme Court acknowledged that "[e]rrors as to one issue need not attach to others." *Trauth v. Dunbar* (1983), 5 Ohio St.3d 68, 70, 5 OBR 123, 125, 448 N.E.2d 1368, 1371, citing *Mast v. Doctor's Hosp. North* (1976), 46 Ohio St.2d 539, 75 O.O.2d 556, 350 N.E.2d 429. Civ.R. 59(A) provides for discretion upon the part of the court in determining the scope of issues on retrial. Limiting the issues on retrial is proper when they are "so distinct and independent from the rest of the case that they may be separately tried without injustice." 6A Moore, Federal Practice (1992) 59.56, Paragraph 59.06. As did the court in *Ecker v. Potts* (C.A.D.C.1940), 112 F.2d 581, 582, we find the issue of testamentary capacity to be sufficiently distinct from the issue of undue influence to permit retrial of one without the other.

Plaintiffs' second and third parts of this assigned error concern evidentiary rulings by the court and limitations placed upon plaintiffs' discovery. At trial, plaintiffs' contention that Irene's will was the product of undue influence centered around Michele Smith, a beneficiary under the will. Testimony established that Michele and Reese were present in Irene's room while the terms of her will were discussed with attorney Graves. However, attorney Graves corroborated Michele's testimony that she remained in the room only at Irene's request. Additionally, plaintiffs attempted to present testimony that Michele was deeded property from another elderly person to whom she had provided care. After

sustaining defendants' objection to this testimony on the basis of relevancy plaintiffs gave the following proffer:

"From Nellie Jones, she would have said, your Honor, in response to the line of question that she had discussions with Michele Smith about a woman who we have later identified as Carolyn Huston, who lived in a house next to or near the house on Seward where Michele Smith lived, and that these discussions with Michele Smith were to the effect that Michele and her mother had started taking care of this woman * * * and their expectation was that the woman was going to leave them her house because of this, and that, indeed, in 1990, or [19]89, * * * [attorney] James Graves prepared a deed from Carolyn Huston to Michele Smith for the stated consideration of love and affection."

Given its superior vantage point, the trial court enjoys broad discretion in the admission and exclusion of evidence and will not be reversed absent a clear abuse which has materially prejudiced the opposing party. *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 302, 224 N.E.2d 126, 130; *Humphrey v. State* (1984), 14 Ohio App.3d 15, 18, 14 OBR 18, 21, 469 N.E.2d 981, 985. In limiting the scope of plaintiffs' inquiry, the court noted the series of inferences which must be made. The factfinder would be required to infer that Michele unduly influenced her neighbor into deeding her home to Michele and that Michele acted similarly in her dealings with Irene. The court found such inferences too tenuous to support admission. A court must be given discretion to limit and focus the proceedings to the issues before it. *Guziak v. Guziak* (1992), 80 Ohio App.3d 805, 817, 610 N.E.2d 1135, 1143.

Plaintiffs also contend the court erred in not compelling discovery of a mortgage loan application by Michele Smith. As already stated, numerous witnesses testified as to the course of conduct between Michele and Irene. Not one provided any direct evidence tending to show that Michele unduly influenced Irene in the drafting of her will. Plaintiffs' allegations were based solely upon innuendo. A trial court enjoys considerable discretion in the regulation of discovery proceedings. *State ex rel. Daggett v. Gessaman* (1973), 34 Ohio St.2d 55, 63 O.O.2d 88, 295 N.E.2d 659, paragraph one of the syllabus. The court may permissibly limit discovery so as to prevent mere "fishing expeditions" in an effort to locate incriminating evidence. *Manofsky v. Goodyear Tire & Rubber Co.* (1990), 69 Ohio App.3d 663, 668, 591 N.E.2d 752, 755. Plaintiffs have not demonstrated even indirectly what essential and beneficial information they expected to learn from the loan application.

Plaintiffs next contend that at minimum the issue of undue influence in the making of the codicil should be retried. They point out that interrogatory number five asked the jury only whether the will was the product of undue

influence, not addressing the codicil. Therefore, they assert that the jury's negative response in no way indicates whether the codicil was the product of undue influence. However, we note that under the circumstances of this case plaintiffs can prevail only if the will is found invalid. Only then would plaintiffs share in the estate under the statute of descent and distribution.

Finally, plaintiffs bring to our attention the case of *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 567 N.E.2d 1291, paragraph one of the syllabus, wherein the court held:

"A presumption of undue influence, rebuttable by a preponderance of the evidence, arises when (i) the relationship of attorney and client exists between a testator and an attorney, (ii) the attorney is named as a beneficiary in the will, (iii) the attorney/beneficiary is not related by blood or marriage to the testator, and (iv) the attorney/beneficiary actively participates in the preparation of the will."

From this plaintiffs contend the trial court erred in not instructing the jury of a presumption that Michele Smith unduly influenced Irene in the making of her will. Plaintiffs point out the parallels between this case and *Krischbaum*. Michele, a coexecutor and beneficiary under the will, was present during discussions leading to the drafting of the will and is not related to Irene. However, we find the dissimilarities to be of greater importance. While present in the room while Irene discussed with attorney Graves the making of her will, Michele did not actively participate in the discussion. Unlike the attorney in *Krischbaum*, Michele had no role in the actual drafting of the will. Accordingly, as did the trial court, we find the rule of law as stated in *Krischbaum* to be inapposite to this case.

Based upon the foregoing, plaintiffs' second assignment of error is overruled.

### Assignment of Error III

"The trial court erred in not directing a verdict that the will and codicil of Irene Willis were invalid as a matter of law."

### Defendants' Cross–Assignment of Error

"The trial court erred by refusing to grant the defendants' motion for a directed verdict at the close of plaintiffs' case and again at the close of all evidence."

Both plaintiffs and defendants argue that the court erred in denying their respective motions for directed verdict. "A motion for directed verdict does not present a question of fact or raise factual issues, but instead presents a question of law, even though in deciding such a motion it is necessary to review

and consider the evidence." *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935, paragraph one of the syllabus. In deciding a motion for directed verdict the court must, after construing the evidence most strongly in favor of the nonmoving party, determine whether reasonable minds could come to but one conclusion on the evidence submitted, that conclusion being adverse to such party. Civ.R. 50(A); *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467; *Humphrey v. Dent* (1980), 62 Ohio St.2d 273, 16 O.O.3d 321, 405 N.E.2d 284.

 Unlike a motion for directed verdict, a grant of new trial under Civ.R. 59(A) requires the court to weigh all of the evidence. *Rohde, supra,* 23 Ohio St.2d at 91, 52 O.O.2d at 381, 262 N.E.2d at 691. Thus, while the evidence may be sufficiently conflicting to warrant denial of a motion for directed verdict, in weighing the evidence the court may properly find that the verdict is not sustained by sufficient evidence. *Id.*

In the present case, we will not attempt to restate the evidence more than we already have. In reviewing the evidence most favorable to both sides, without weighing it or passing upon the credibility of witnesses, we find that reasonable minds could reach conflicting views of the evidence submitted. Therefore, the court did not err in denying the motions for directed verdict.

Having reviewed and overruled each assignment and cross-assignment of error, we affirm the judgment of the trial court.

*Judgment affirmed.*

CACIOPPO, P.J., and COOK, J., concur.

MARY CACIOPPO, J., retired, of the Ninth Appellate District, sitting by assignment.